# AUSTIN *v.* TENNESSEE.

ERROR TO THE SUPREME COURT OF THE STATE OF TENNESSEE.

No. 25.   Argued November 9, 10, 1899.—Decided November 19, 1900.

Tobacco being a legitimate article of commerce, the court cannot take judicial notice of the fact that it is more noxious in the form of cigarettes than in any other.   It is, however, to the same extent as intoxicating liquors, within the police power of the State.

It is within the province of the legislature to declare how far cigarettes may be sold, or to prohibit their sale entirely, after they have been taken from the original packages or have left the hands of the importer, provided no discrimination be used as against those imported from other States, and there be no reason to doubt that the act in question is designed for the protection of the public health.

Original packages are such as are used in *bona fide* transactions carried on between the manufacturer and wholesale dealers residing in different States.   Where the size of the package is such as to indicate that it was prepared for the purpose of evading the law of the State to which it is sent, it will not be protected as an original package against the police laws of that State.

Where cigarettes were imported in paper packages of three inches in length and one and one half in width, containing ten cigarettes, unboxed but thrown loosely into baskets: *held*, that such paper parcels were not original packages within the meaning of the law, and that such importations were evidently made for the purpose of evading the law of the State prohibiting the sale of cigarettes.

THIS was a writ of error to review the conviction of Austin for the sale of cigarettes in violation of an act of the General Assembly of Tennessee, (chap. 30, Acts of 1897,) the material portion of which reads as follows:

"Be it enacted by the General Assembly of the State of Tennessee, That it shall be a misdemeanor for any person, firm or corporation to sell, offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of, any cigarettes, cigarette paper, or substitute for the same; and a violation of any of the provisions of this act shall be a misdemeanor punishable by a fine of not less than fifty dollars."

Defendant was convicted in the Circuit Court of Monroe

County; fined fifty dollars and committed until the fine should be paid; and upon appeal to the Supreme Court of Tennessee the judgment of the Circuit Court was affirmed.    101 Tenn. 563.

*Mr. W. W. Fuller* and *Mr. John G. Johnson* for plaintiff in error.    *Mr. J. Parker* was on their brief.

*Mr. G. W. Pickle* for defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

It is charged that the act in question, in its application to the facts of this case, is an infringement upon the exclusive power of Congress to regulate commerce between the States.    This is the sole question presented for our determination.

We are not disposed to question the general principle that the States cannot, under the guise of inspection or revenue laws, forbid or impede the introduction of products, and more particularly of food products, universally recognized as harmless, *Minnesota* v. *Barber*, 136 U. S. 313; *Brimmer* v. *Rebman*, 138 U. S. 78, or otherwise burden foreign or interstate commerce by regulations adopted under the assumed police power of the State, but obviously for the purpose of taxing such commerce or creating discriminations in favor of home producers or manufacturers.    *The Passenger Cases*, 7 How. 283; *Welton* v. *Missouri*, 91 U. S. 275; *Henderson* v. *New York*, 92 U. S. 259; *Railroad Co.* v. *Husen*, 95 U. S. 465; *Guy* v. *Baltimore*, 100 U. S. 434; *Ward* v. *Maryland*, 12 Wall. 418; *People* v. *Compagnie Gen. Transatlantique*, 107 U. S. 59.    In this connection we indorse fully what was said by this court in *Mugler* v. *Kansas*, 123 U. S. 623, 661 : "If, therefore, a statute purporting to have been enacted to protect the public health, the public morals or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby to give effect to the Constitution."

The Supreme Court of Tennessee placed its decision of this case upon two grounds : First, that cigarettes were not legiti-

mate articles of commerce; second, that the sale shown to have been made was not the sale of an original package in the true commercial sense.

1. We are not prepared to fully indorse the opinion of that court upon the first point. Whatever product has from time immemorial been recognized by custom or law as a fit subject for barter or sale, particularly if its manufacture has been made the subject of Federal regulation and taxation, must, we think, be recognized as a legitimate article of commerce although it may to a certain extent be within the police power of the States. Of this class of cases is tobacco. From the first settlement of the colony of Virginia to the present day tobacco has been one of the most profitable and important products of agriculture and commerce, and while its effects may be injurious to some, its extensive use over practically the entire globe is a remarkable tribute to its popularity and value. We are clearly of opinion that it cannot be classed with diseased cattle or meats, decayed fruit or other articles, the use of which is a menace to the health of the entire community. Congress, too, has recognized tobacco in its various forms as a legitimate article of commerce by requiring licenses to be taken for its manufacture and sale, imposing a revenue tax upon each package of cigarettes put upon the market, and by making express regulations for their manufacture and sale, their exportation and importation. Cigarettes are but one of the numerous manufactures of tobacco, and we cannot take judicial notice of the fact that it is more noxious in this form than in any other. Whatever might be our individual views as to its deleterious tendencies, we cannot hold that any article which Congress recognizes in so many ways is not a legitimate article of commerce. The language of Chief Justice Taney in the *License Cases*, 5 How. 504, with reference to intoxicating liquors is so pertinent to this case that it deserves to be here repeated:

" But spirits and distilled liquors are universally admitted to be subject of ownership and property, and are therefore subjects of exchange, barter and traffic, like any other commodity in which a right of property exists. And Congress, under its general power to regulate commerce with foreign nations, may

prescribe what article of merchandise shall be admitted and what excluded; and may, therefore, admit or not, as it shall deem best, the importation of ardent spirits. And inasmuch as the laws of Congress authorize their importation, no State has a right to prohibit their introduction."

"But I do not understand the law of Massachusetts or Rhode Island as interfering with the trade in ardent spirits while the article remains a part of foreign commerce, and is in the hands of the importer for sale, in the cask or vessel in which the laws of Congress authorize it to be imported. These state laws act altogether upon the retail or domestic traffic within their respective borders. They act upon the article after it has passed the line of foreign commerce, and become a part of the general mass of property in the State. These laws may, indeed, discourage imports, and diminish the price which ardent spirits would otherwise bring. But although a State is bound to receive and to permit the sale by the importer of any article of merchandise which Congress authorizes to be imported, it is not bound to furnish a market for it, nor to abstain from the passage of any law which it may deem necessary or advisable to guard the health or morals of its citizens, although such law may discourage importation, or diminish the profits of the importer, or lessen the revenue of the general government. And if any State deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice or debauchery, I see nothing in the Constitution of the United States to prevent it from restraining the traffic, or from prohibiting it altogether, if it thinks proper."

The same ruling with regard to the power of the States to prohibit the sale of intoxicating liquors was made in *Bartemeyer* v. *Iowa*, 18 Wall. 129, in which it was held the right to sell such liquors was not a privilege or immunity which, by the Fourteenth Amendment, the States were forbidden to abridge. And in the later case of *Beer Co.* v. *Massachusetts*, 97 U. S. 25, it was held that a company chartered "for the purpose of manufacturing malt liquors in all their varieties" held its franchise subject to the police power of the State, and that, if the public safety or public morals required the discontinuance of such

manufactures, the legislature might so provide, notwithstanding individuals and corporations might thereby suffer inconvenience. In *Mugler* v. *Kansas*, 123 U. S. 623, and *Kidd* v. *Pearson*, 128 U. S. 1, the principle of this case was extended so far as to hold that such laws might be enforced against persons who, at the time, happened to own property whose chief value consisted in its fitness for manufacturing intoxicating liquors, without compensating them for the diminution in value resulting from such prohibitory enactments; and in *Foster* v. *Kansas*, 112 U. S. 201, it was regarded as the settled doctrine of this court that such laws, prohibiting the sale and manufacture of intoxicating liquors, were not repugnant to the Constitution of the United States.

How far such laws could be made applicable to articles admitted to be innocuous has never been decided by this court. Nor is it necessary to the decision of this case. It was held, however, in *Powell* v. *Pennsylvania*, 127 U. S. 678, that a statute of Pennsylvania prohibiting the manufacture or sale of oleomargarine was a lawful exercise by the State of its power to protect by police regulations the public health, and that it neither denied to persons within the jurisdiction of the State the equal protection of the laws, nor deprived them of their property without compensation, and was not otherwise repugnant to the Fourteenth Amendment. Said Mr. Justice Harlan: " It [this court] cannot adjudge that the defendant's rights of liberty and property, as thus defined, have been infringed by the statute of Pennsylvania, without holding that, although it may have been enacted in good faith for the objects expressed in its title, namely, to protect the public health and to prevent the adulteration of dairy products and fraud in the sale thereof, it has, in fact, no real or substantial relation to these objects. The court is unable to affirm that this legislation has no real or substantial relation to such objects." So, too, in *Plumley* v. *Massachusetts*, 155 U. S. 461, a statute of Massachusetts prohibiting the sale of oleomargarine artificially colored so as to cause it to look like yellow butter, and so brought into the State, was decided not to be in conflict with the commerce clause of the Constitution.

These cases recognize the fact that intoxicating liquors belong to a class of commodities which, in the opinion of a great many estimable people, are deleterious in their effects, demoralizing in their tendencies, and often fatal in their excessive indulgence; and that, while their employment as a medicine may sometimes be beneficial, their habitual and constant use as a beverage, whatever it may be to individuals, is injurious to the community. It may be that their evil effects have been exaggerated, and that, though their use is usually attended with more or less danger, it is by no means open to universal condemnation. It is, however, within the power of each State to investigate the subject and to determine its policy in that particular. If the legislative body come deliberately to the conclusion that a due regard for the public safety and morals requires a suppression of the liquor traffic, there is nothing in the commercial clause of the Constitution, or in the Fourteenth Amendment to that instrument, to forbid its doing so. While, perhaps, it may not wholly prohibit the use or sale of them for medicinal purposes, it may hedge about their use as a general beverage such restrictions as it pleases. Nor can we deny to the legislature the power to impose restrictions upon the sale of noxious or poisonous drugs, such as opium and other similar articles, extremely valuable as medicines, but equally baneful to the habitual user.

Cigarettes do not seem until recently to have attracted the attention of the public as more injurious than other forms of tobacco; nor are we now prepared to take judicial notice of any special injury resulting from their use or to indorse the opinion of the Supreme Court of Tennessee that "they are inherently bad and bad only." At the same time we should be shutting our eyes to what is constantly passing before them were we to affect an ignorance of the fact that a belief in their deleterious effects, particularly upon young people, has become very general, and that communications are constantly finding their way into the public press denouncing their use as fraught with great danger to the youth of both sexes. Without undertaking to affirm or deny their evil effects, we think it within the province of the legislature to say how far they may be sold,

or to prohibit their sale entirely, after they have been taken from the original packages or have left the hands of the importer, provided no discrimination be used as against such as are imported from other States, and there be no reason to doubt that the act in question is designed for the protection of the public health.

We have had repeated occasion to hold, where state legislation has been attacked as violative either of the power of Congress over interstate commerce, or of the Fourteenth Amendment to the Constitution, that, if the action of the state legislature were a *bona fide* exercise of its police power, and dictated by a genuine regard for the preservation of the public health or safety, such legislation would be respected, though it might interfere indirectly with interstate commerce. While, as was said in *Holden* v. *Hardy*, 169 U. S. 366, 392, " the police power cannot be put forward as an excuse for oppressive and unjust legislation, it may be lawfully resorted to for the purpose of preserving the public health, safety or morals, or the abatement of public nuisances, and a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what means are necessary for the protection of such interests." Thus, while in *Railroad Co.* v. *Husen*, 95 U. S. 465, it was held that a statute of Missouri, prohibiting the driving or bringing of any Texas, Mexican or Indian cattle into the State, was in conflict with the interstate commerce clause of the Constitution, it was subsequently held that the introduction of diseased cattle might be prohibited altogether, or subjected to such regulations as the legislature chose to impose. *Missouri, Kansas & Texas Railway* v. *Haber*, 169 U. S. 613. So, too, although it was held in *Barbier* v. *Connolly*, 113 U. S. 27, and in *Soon Hing* v. *Crowley*, 113 U. S. 703, that a municipal ordinance prohibiting laundry work within certain territorial limits and within certain hours was purely a police regulation, such an ordinance was void, if it conferred upon the municipal authorities arbitrary power at their own will and without regard to discretion in the legal sense of the term, to give or withhold consent as to persons or places, without regard to the competency of the persons applying, or the propriety of

the place selected for carrying on business. *Yick Wo* v. *Hop-kins*, 118 U. S. 356. In delivering the opinion Mr. Justice Matthews observed : " Though the law itself be fair on its face and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

We are therefore of opinion that although the State of Tennessee may not wholly interdict commerce in cigarettes it is not, in the language of Chief Justice Taney in the *License Cases*, " bound to furnish a market for it, [them] nor to abstain from the passage of any law which it may deem necessary or advisable to guard the health or morals of its citizens, although such law may discourage importation, or diminish the profits of the importer, or lessen the revenue of the General Government."

2. There is no reason to doubt the good faith of the legislature of Tennessee in prohibiting the sale of cigarettes as a sanitary measure, and if it be inoperative as applied to sales by the owner in the original packages, of cigarettes manufactured in and brought from another State, we are remitted to the inquiry whether a paper package of three inches in length and one and a half inches in width, containing ten cigarettes, is an original package protected by the Constitution of the United States against any interference by the State while in the hands of the importer ? This we regard as the vital question in the case.

The whole law upon the subject of original packages is based upon a decision of this court, in *Brown* v. *Maryland*, 12 Wheat. 419, in which a statute of Maryland, requiring all importers of foreign articles, " by bale or package," or of intoxicating liquors, and other persons selling the same, " by wholesale, bale or package, hogshead, barrel or tierce," to take out a license, was held to be repugnant to that provision of the Constitution forbidding States from laying a duty upon imports, as well as to that declaring that Congress should have power to regulate commerce with foreign nations. There was thought to be no difference between a power to prohibit the sale of an article while it was

an import and the power to prohibit its introduction into the country. The one would be the necessary consequence of the other. No goods would be imported if none could be sold. But, in delivering the opinion of the court, Mr. Chief Justice Marshall observed : " It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has perhaps lost its distinctive character as an import, and has become subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution." This sentence contains in a nutshell the whole doctrine upon the subject of original packages, upon which so formidable a structure has been attempted to be erected in subsequent cases. Whether the decision would have been the same if the original packages in that case, instead of being bales of dry goods or hogsheads, barrels or tierces of liquors, had been so minute in size as to permit of their sale directly to consumers, may admit of considerable doubt. Obviously the doctrine of the case is directly applicable only to those large packages in which from time immemorial it has been customary to import goods from foreign countries. It is safe to assume that it did not occur to the Chief Justice that, by a skilful alteration of the size of the packages, the decision might be used to force upon a reluctant people the use of articles denounced as noxious by the legislatures of the several States.

A casual remark, however, made by Chief Justice Marshall in that case, that " we suppose the principles laid down in this case to apply equally to importations from a sister State " was subsequently considered in *Woodruff* v. *Parham*, 8 Wall. 123, and was held to have no application to commerce between the States, the court deciding that the term "import," as used in that clause, which declares that " no State shall levy any imposts or duties on imports or exports," did not refer to articles imported from one State into another, but only to articles imported from foreign countries into the United States. In

that case an ordinance of the city of Mobile, authorizing a tax upon sales at auctions, was held to be applicable to products of States other than Alabama, although the articles were sold in the original and unbroken packages.

The principle of this case was subsequently applied in *Brown* v. *Houston*, 114 U. S. 622, in which it was held that coal mined in Pennsylvania and sent by water to New Orleans to be sold in open market there on account of the owners in Pennsylvania, became intermingled, on arrival there, with the general property of the State of Louisiana, and was subject to taxation under the laws of that State, although it might be, after arrival, sold from the vessel upon which the transportation was made, and without being landed, and for the purpose of being taken out of the country on a vessel bound to a foreign port. In delivering the opinion of the court Mr. Justice Bradley observed:

"It cannot be seriously contended, at least in the absence of any congressional legislation to the contrary, that all goods which are the product of other States are to be free from taxation in the State to which they may be carried for use or sale. Take the city of New York, for example, when the assessor of taxes goes his round, must he omit from his list of taxables all goods which have come into the city from the factories of New England and New Jersey, or from the pastures and grain fields of the West? If he must, what will be left for taxation? And how is he to distinguish between those goods which are taxable and those which are not? With the exception of goods imported from foreign countries, *still in the original packages,* and goods in transit to some other place, why may he not assess all property alike that may be found in the city, *being there for the purpose of remaining there until used or sold,* and constituting part of the great mass of commercial capital — provided, always, that the assessment be a general one, and made without discrimination between goods the product of New York and goods the product of other States? Of course, the assessment should be a general one, and not discriminative between goods of different States. The taxing of goods coming from other States as such, or by reason of their so coming, would be a discriminating tax against them as imposts, and would be a regulation of inter-

state commerce, inconsistent with that perfect freedom of trade which Congress has seen fit should remain undisturbed. But, if, after their arrival within the State—that being their place of destination for use of trade—if, after this, they are subjected to a general tax laid alike on all property within the city, we fail to see how such a taxing can be deemed a regulation of commerce which would have the objectionable effect referred to."

The principle of this case was applied subsequently in that of *Pittsburgh & Southern Coal Co.* v. *Bates,* 156 U. S. 577.

In *Leisy* v. *Hardin,* 135 U. S. 100, 122 quarter barrels of beer, 171 one eighth barrels of beer and eleven cases of beer were seized by the city marshal of Keokuk under a state statute prohibiting the sale of intoxicating liquors. It was held that, being articles of lawful commerce, the State could not, in the absence of legislation on the part of Congress, prohibit their importation from abroad or from a sister State; or, when imported, prohibit their sale by the importer, and that they did not become a part of the common mass of property within the State so long as they remained in the casks in which they were imported and continued to be the property of the importer. No question was made with regard to the casks being original packages, or as to the fact that, according to the custom of brewers, beer was usually and ordinarily imported from one State to another in casks of this size.

In the still later case of *Schollenberger* v. *Pennsylvania,* 171 U. S. 1, oleomargarine was recognized as a lawful article of commerce, and one which could not be wholly excluded from importation into a State from another State where it was manufactured, and so long as it remained in its original packages could be sold, notwithstanding a statute of the State prohibiting such sale. The oleomargarine in that case was imported and sold in packages of ten pounds weight; but it appeared in the special verdict that the package was an original package, as required by the act of Congress, and was of such "form, size and weight as is used by producers or shippers for the purpose of securing both convenience in handling and security in transportation of merchandise between dealers in the ordinary course

of actual commerce, and the said form, size and weight were adopted in good faith, and not for the purpose of evading the laws of the Commonwealth of Pennsylvania, said package being one of a number of similar packages forming one consignment shipped by the said company to the said defendant."

Most pertinent to this case, and, as we think, covering its principle completely, is the opinion of this court in *May* v. *New Orleans*, 178 U. S. 496, decided at the last term. This involved the validity of certain tax assessments made by the city of New Orleans upon the merchandise and stock in trade of the plaintiff, which consisted of dry goods imported from foreign countries, upon which duties had been levied by and paid to the General Government. The goods were put up and sold in packages, a large number of such packages being inclosed in wooden cases or boxes for the purposes of importation. Upon arrival at New Orleans the boxes were opened, the packages taken out and sold unbroken. The question was whether the box or case containing these packages, or the packages themselves were the original packages within the case of *Brown* v. *Maryland*, 12 Wheat. 419. It was conceded that, so long as the packages remained in their original cases, they were not subject to taxation, but the court held that this immunity ceased as soon as the boxes were opened. As stated by Mr. Justice Harlan in delivering the opinion of the court (p. 508):

"In our judgment, the 'original package' in the present case was the box or case in which the goods imported were shipped, and when the box or case was opened for the sale or delivery of the separate parcels contained in it, each parcel of the goods lost its distinctive character as an import, and became property subject to taxation by the State as other like property situated within its limits. The tax here in question was not in any sense a tax on imports nor a tax for the privilege of bringing the things imported into the State. It was not a tax on the plaintiff's goods because they were imported from another country, but because at the time of the assessment they were in the market for sale in separate parcels and therefore subject to be taxed as like property, in the same condition, that had its origin in this country. We cannot impute to the framers of the Con-

stitution a purpose to make such a discrimination in favor of property imported from other countries as would result if we approved the views pressed upon us by the plaintiffs. When their goods had been so acted upon as to become a part of the general mass of property in the State the plaintiffs stood, with respect to liability to state taxation, upon the same basis of equality as the owners of like property, the product of this country; the only difference being that the importers paid a duty to the United States for the privilege of importing their goods into this country, and of selling them in the original packages—a duty imposed for the purpose of raising money to carry on the operations of the Government, and, in many instances, with the intent to protect the industries of this country against foreign competition."

The case under consideration is really the first one presenting to this court distinctly the question whether, in holding that the State cannot prohibit the sale in its original package of an article brought from another State, the size of the package is material, although some of the expressions in the *License Cases* seem to foreshadow the consequences likely to result from the argument of the defendant. Thus, it is stated by Mr. Justice Catron, 5 How. 608, that "to hold that the state license law [of New Hampshire] was void, as respects spirits coming in from other States as articles of commerce, would open the door to an almost entire evasion, as the spirits might be introduced in the smallest divisible quantities that the retail trade would require; the consequences of which would be that the dealers in New Hampshire would sell only spirits produced in other States, and that the products of New Hampshire would find an unrestrained market in the neighboring States having similar license laws to those of New Hampshire." And also in the opinion of Mr. Justice Woodbury, rendered in the same case (p. 625): " If the proposition was maintainable, that, without any legislation by Congress as to the trade between the States, (except that in coasting, as before explained, to prevent smuggling,) anything imported from another State, foreign or domestic, could be sold of right in the package in which it was imported, not subject to any license or any internal regulation of a State,

then it is obvious that the whole license system may be evaded and nullified, either from abroad or from a neighboring State. And the more especially can it be done from the latter, as imports may be made in bottles of any size, down to half a pint, of spirits or wines; and if its sale cannot be interfered with and regulated, the retail business can be carried on in any small quantity, and by the most irresponsible and unsuitable persons, with perfect impunity." These words are certainly prophetic in their applicability to this case.

Similar questions have arisen in the Federal courts of original jurisdiction, whose decisions have generally been in favor of the position taken by the plaintiff in error in this case. The same question has been considered in the courts of several States, and their decisions have been with almost equal unanimity the other way.

In *Commonwealth* v. *Zelt*, 138 Penn. St. 615, a distiller manufacturing over the state line established a store or agency within the State, put up his liquors in bottles ranging in capacity from one quart down to one half pint, and, packing them in unsealed barrels, sent them to the Pennsylvania store, where they were taken from the barrels, put upon the shelves and sold to customers. The question was submitted to the jury, which, as stated by the court, evidently regarded defendant's method as a trick and an evasion of the state statute. The judgment was affirmed. In *Commonwealth* v. *Schollenberger*, 156 Penn. St. 201, (not the case reported in 171 U. S. 1,) an original package is defined to be "such form and size of package as is used by producers or shippers for the purpose of securing both convenience in handling, and security in transportation of merchandise between dealers in the ordinary course of actual commerce." Where a mode of putting up a package is not adapted to meet the requirements of interstate commerce, but the requirements of an unlawful domestic retail trade, the dealer will not be protected on the ground that he is selling an original package. The opinion contains a very vigorous denunciation of the methods resorted to by this class of dealers. The following paragraphs are sufficiently illustrative of the general purport of the decision: " Intrenched behind the

interstate commerce clause so construed, citizens of other States could prey upon our people, trample upon our laws, and make gain out of a traffic forbidden to our citizens only to be delivered up absolutely and unconditionally to them. It would require only that such citizen of another State should establish a local store in some of our towns and cities, or in all of them, conduct a local business, to meet a local demand, and, when called upon by the officers of the law, make the reply that he made the goods in some other State, and, as a manufacturer, supplied himself, as a local dealer, with wares of a foreign origin. Neither the foreign origin of the goods sold, nor of the seller, nor of both together, will convert a business that is local and interstate into one that is general and interstate within the meaning of the Constitution of the United States. . . . One who plants his foot squarely upon the police laws of this State and defies its officers to suppress or to punish his unlawful trade, must show a clear legal right to take and maintain his position as a public enemy, or suffer the penalty of the broken law. To hold otherwise would make it impossible for the people of any State to protect themselves from evils that by common consent throughout the civilized world need to be restrained and removed by suitable legislation. It would also strike a blow of absolutely crushing weight at the existence of the police power in the several States, and render all attempts at its exercise ineffectual and useless."

In the case of *Commonwealth* v. *Bishman,* 138 Penn. St. 639, defendant sold liquor in pint and quart bottles, each of which was enclosed in a pasteboard box, sealed with a strip of paper pasted across the lid, and stamped with the name of the firm. These packages were shipped in boxes and barrels to defendant's agent, who unpacked them when they arrived, and placed the pasteboard packages on his shelves. The court held that there was abundance of evidence to submit to the jury whether the whole matter was not a scheme to evade the license laws. Said the court: " The defendant was engaged in selling liquor at retail, and his claim that he was selling only original packages was little better than a burlesque."

In *Commonwealth* v. *Paul,* 170 Penn. St. 284, a small tub of

oleomargarine, containing ten pounds, prepared in another State and brought into Pennsylvania to be sold unbroken to a customer for his use as an article of food upon his table, and actually so sold, was held. not to be an original package within the meaning of the law relating to interstate commerce. Said the court: "If a pint bottle of whiskey is an original package under the protection of Congress, and can be sold as such, regardless of the police legislation of the State, we cannot punish the sale to a minor, to a person of known intemperate habits, to a lunatic, on election days, or on the Sabbath. All power over the traffic for police purposes is gone. And why? Because the power to regulate interstate commerce, intended to guard against stoppage along state lines for examination or the collection of customs duties, has been extended by construction until it is made to reach and protect a retail traffic carried on within any State, if the things sold have come into the retailer's store from a non-resident manufacturer or shipper. . . Our question is whether this valid restriction can be enforced, or whether the transparent trick of putting up oleomargarine in small packages in another State, so that it can be sold at retail to consumers as an article of food, will clothe an unlawful retail traffic with the coat of mail belonging to honest, legitimate interstate commerce, and set the police laws of the State at defiance?"

In *Haley* v. *Nebraska*, 42 Nebraska, 556, the same result was reached upon precisely the same state of facts; as well as in *State* v. *Chapman*, 1 South Dakota, 414; and *Smith* v. *State*, 54 Arkansas, 248.

In *McGregor* v. *Cone*, 104 Iowa, 465, the question arose as to packages of cigarettes of the same size as those involved in the present case. These packages were placed in a common pine box for convenience of shipment without any other packing or enclosure about the packages, and were shipped by the company from its factory in New York to its warehouse in Chicago, and thence to the defendant's place of business in Iowa. Upon the arrival of the box the defendant opened the box by taking the lid off, and sold one of the packages containing cigarettes. It was held that the pine box was the original package, and that

the defendant was liable, notwithstanding that the internal revenue department had, for the purposes of taxation, declared the small packages sold by defendant to be original packages. This case seems to have overruled the cases of *State* v. *Coonan*, 82 Iowa, 400; *Collins* v. *Hills*, 77 Iowa, 181; *Hopkins* v. *Lewis*, 86 Iowa, 638; *State* v. *Miller*, 84 Iowa, 690, where a contrary view was expressed.

The real question in this case is whether the size of the package in which the importation is actually made is to govern; or, the size of the package in which *bona fide* transactions are carried on between the manufacturer and the wholesale dealer residing in different States. We hold to the latter view. The whole theory of the exemption of the original package from the operation of state laws is based upon the idea that the property is imported in the ordinary form in which, from time to time immemorial, foreign goods have been brought into the country. These have gone at once into the hands of the wholesale dealers, who have been in the habit of breaking the packages and distributing their contents among the several retail dealers throughout the State. It was with reference to this method of doing business that the doctrine of the exemption of the original package grew up. But taking the words " original package" in their literal sense, a number of so-called original package manufactories have been started through the country, whose business it is to manufacture goods for the express purpose of sending their products into other States in minute packages, that may at once go into the hands of the retail dealers and consumers, and thus bid defiance to the laws of the State against their importation and sale. In all the cases which have heretofore arisen in this court the packages were of such size as to exclude the idea that they were to go directly into the hands of the consumer, or be used to evade the police regulations of the State with regard to the particular article. No doubt the fact that cigarettes are actually imported in a certain package is strong evidence that they are original packages within the meaning of the law; but this presumption attaches only when the importation is made in the usual manner prevalent among honest dealers, and in a *bona fide* package of

a particular size. Without undertaking to determine what is the proper size of an original package in each case, evidently the doctrine has no application where the manufacturer puts up the package with the express intent of evading the laws of another State, and is enabled to carry out his purpose by the facile agency of an express company and the connivance of his consignee. This court has repeatedly held that, so far from lending its authority to frauds upon the sanitary laws of the several States, we are bound to respect such laws and to aid in their enforcement, so far as can be done without infringing upon the constitutional rights of the parties. The consequences of our adoption of defendant's contention would be far-reaching and disasterous. For the purpose of aiding a manufacturer in evading the laws of a sister State, we should be compelled to recognize anything as an original package of beer from a hogshead to a vial; anything as a package of cigarettes from an importer's case to a single paper box of ten, or even a single cigarette, if imported separately and loosely; anything from a bale of merchandise to a single ribbon, provided only the dealer sees fit to purchase his stock outside the State and import it in minute quantities.

There could hardly be stronger evidence of fraud than is shown by the facts of this case, which we quote from the opinion of the court:

"The defendant purchased from the American Tobacco Company, at its factory, in Durham, North Carolina, a lot of cigarettes manufactured by that company at that factory, and there by it put into pasteboard boxes, in quantities of ten cigarettes to each box; that each of these boxes, known as packages, was separately stamped and labeled, as prescribed by the United States revenue statute; that after defendant's purchase the American Tobacco Company piled upon the floor of its warehouse, in Durham, North Carolina, the number of boxes or packages sold, and, having done so, notified the Southern Express Company to come and get them, and said company, by its agent, took them from the floor and placed them in an open basket already and previously in the possession of the Southern Express Company, and in that basket had them transported by

express to the defendant's town in Tennessee, and there an agent of the same express company took the basket to defendant's place of business and lifted from it on to the counter of the defendant the lot of detached boxes or packages of cigarettes, and thereupon took a receipt and departed with the empty basket. Thereafter the defendant sold one of these boxes or packages without breaking it, and for that sale he stands convicted."

And yet we are told that each one of these packages is an original package, and entitled to the protection of the Constitution of the United States as a separate and distinct importation. We can only look upon it as a discreditable subterfuge, to which this court ought not to lend its countenance. If there be any original package at all in this case we think it is the basket and not the paper box.

Suppose the State of Tennessee in the exercise of its police powers should prohibit the manufacture within its limits of cigarettes, whether they were manufactured to be sold in that State, or to be sent to other States for sale, could the validity of such legislation be questioned, as in violation of the Constitution of the United States, upon the ground that it infringed the liberty which is secured to the citizens by the Fourteenth Amendment? "The liberty mentioned in that amendment," this court has said, "means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned." *Allgeyer* v. *Louisiana,* 165 U. S. 578, 589.

There is doubtless fair ground for dispute as to whether the use of cigarettes is not hurtful to the community, and therefore it would be competent for a State, with reference to its own people, to declare, under penalties, that cigarettes should not be manufactured within its limits. No one could say that such

. legislation trenched upon the liberty of the citizen by preventing him from pursuing a lawful business. Now the result of defendant's argument in this case is that citizens of Tennessee may, under the commerce clause of the Constitution of the United States, bring into that State from other States cigarettes in unlimited quantities, and sell them despite the will of Tennessee as expressed in its legislation. In other words, it is decided, that the commerce clause of the Constitution, by its own force, without any legislation by Congress, overrides the action of the State in a matter confessedly involving, in the judgment of its legislature, the health of its people. We cannot accept this view. The doctrine that the silence of Congress as to what property may be of right carried from one State to another means that every article of commerce may be carried into one State from another and there sold, ought not to be . extended so as to embrace articles which may not unreasonably be deemed injurious in their use to the health of the people. If this be not so, it follows that the reserved power of the State to protect the health of its people, by reasonable regulations, has application only in respect of articles manufactured within its own limits; and that an open door exists for the introduction into the State, against its will, of all kinds of property which may be fairly regarded as injurious in their use to health. If Congress have power to declare what property may and what may not be brought into one State from another State, then the action of a State by which certain articles, not unreasonably deemed injurious to health, were excluded from its markets, should stand until Congress legislated upon the subject. If Congress possesses no such power, it is because the framers of the Constitution never intended that the mere grant of power to regulate commerce should override the power reserved by the States to pass laws that had substantial relations to the health of their people. Of course, it is one thing to force into a State, against its will, articles or commodities that can have no possible connection with or relation to the health of the people. It is quite a different thing to force into the markets of a State, against its will, articles or commodities which, like cigarettes, may not unreasonably be held to be injurious to health.

MR. JUSTICE WHITE, concurring.

Practically the only argument relied upon in support of the theory that these packages of ten cigarettes are original packages is derivable from the Revised Statutes, section 3392, which requires that manufacturers shall put up all cigarettes made by or for them, and sold or removed for consumption or use, in packages containing ten, twenty, fifty or one hundred cigarettes each. This, however, is solely for the purpose of taxation—a precaution taken for the better enforcement of the internal revenue law, and to be read in connection with section 3243, which provides that " the payment of any tax imposed by the internal revenue laws for carrying on any trade or business shall not be held to exempt any person from any penalty or punishment provided by the laws of any State for carrying on the same within such State, or in any manner to authorize the commencement or continuance of such trade or business contrary to the laws of such State." As was said in *Plumley* v. *Massachusetts,* 155 U. S. 461, 466, it is manifest this section was adopted to make it clear that Congress had no purpose to restrict the power of the State over the manufacture and sale of particular articles. " The taxes prescribed by that act were for national purposes, and their imposition did not give authority to those who paid them to engage in the manufacture or sale of oleomargarine in any State which lawfully forbade such manufacture and sale." The question is not in what packages the law requires the cigarettes to be packed for the purpose of taxation, but what are the packages in which they are usually transported from one State to another where the transaction is *bona fide* and for the legitimate purposes of trade and commerce.

We are satisfied the conclusion of the Supreme Court of Tennessee was correct, and it is therefore

*Affirmed.*

MR. JUSTICE WHITE, concurring.

I do not understand that anything in the opinion of the court impairs the doctrine protecting original packages from interference by the police or any other power of a State, as announced by so many opinions of this court, especially as ex-

pounded in *Leisy* v. *Hardin*, 135 U. S. 100, and *Rhodes* v. *Iowa*, 170 U. S. 412, and the authorities which are cited in the opinions of the court in both of those cases. If I thought either the opinion of the court just announced or the conclusion which it reaches had the effect of weakening the doctrine upheld by the authorities to which I have just referred, I should be unable to concur. Indeed, as I understand the case as now decided, all the questions adverted to are merged in the solution of the one decisive issue, which is, Was each particular parcel of cigarettes an original package within the constitutional import of those words as defined by the previous adjudications of the court? I am constrained to conclude that this question is correctly answered in the negative, not only from the size of each particular parcel, but from all the other surrounding facts and circumstances, among which may be mentioned the trifling value of each parcel, the absence of an address on each, and the fact that many parcels, for the purpose of commercial shipment, were aggregated, thrown into and carried in an open basket. Thus associated in their shipment, they could not, under all the facts and circumstances of the case, after arrival be segregated so as to cause each to become an original package.

MR. JUSTICE BREWER, with whom concurred the CHIEF JUSTICE, MR. JUSTICE SHIRAS and MR. JUSTICE PECKHAM, dissenting.

I dissent from the opinions and judgment in this case. The plaintiff in error was convicted of a violation of the following act of the General Assembly of Tennessee:

"Be it enacted by the General Assembly of the State of Tennessee, That it shall be a misdemeanor for any person, firm or corporation to sell, offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of any cigarettes, cigarette paper or substitute for the same; and a violation of any of the provisions of this act shall be a misdemeanor punishable by a fine of not less than fifty dollars."

The facts shown by the testimony, as appears from the record, are as follows:

"This defendant was on the 1st day of November, 1897, a

JUSTICES BREWER, SHIRAS, PECKHAM and the CHIEF JUSTICE, dissenting.

resident of and merchant in the town of Madisonville, said Monroe County, Tennessee, and in no way connected with the American Tobacco Company, as agent or otherwise; that just prior to said November, 1897, the defendant purchased, in the State of North Carolina, from the American Tobacco Company, a corporation of the State of New Jersey, and having a factory for the manufacture of cigarettes in Durham, N. C., and similar factories at other points in the United States, but having no factory, office, nor warehouse in the State of Tennessee, a number of packages, each containing 10 Duke of Durham cigarettes; that these cigarettes were manufactured by the American Tobacco Company at its factory in said town of Durham, and were packed by it in quantities of 10 in pasteboard slide-boxes, upon each of which such box or package were printed the names of the manufacturers of the cigarettes therein contained, the name or brand of the cigarettes therein contained, the number of the factory and internal revenue collection or manufacturing district in which said factory was located, the number of cigarettes contained in the box or package, the caution notice required by the laws of the United States, the internal revenue stamp for 10 cigarettes pasted across the end of such box or package, so as to act as a seal thereon and thereof, and which had to be broken and destroyed to open said box or package, and all the other requirements of the laws and regulations of the United States governing the packing and sale of cigarettes. A package in all respects similar to those bought by defendant at Durham, N. C., is hereto attached, marked ' Exhibit A.' These packages were packed and manufactured by said American Tobacco Company at Durham, N. C., and were by it shipped from said town of Durham, N. C., to defendant by the Southern Express Company, without case, covering, or enclosure of any kind around or about any of said packages, but were by said American Tobacco Company piled upon the floor of its warehouse in Durham, N. C., and said Southern Express Company notified to come and get them, and said express company, by its agent, took them, the said enclosed packages, and placed them in an open basket, already and heretofore in the possession of said Southern Express Company; that these

packages were brought to the place of business of defendant by an agent of said express company in the same open basket in which they had been placed by said express company at Durham, N. C., and by said agent lifted from said basket on to the counter in the place of business of defendant, and so delivered to and receipted for by the defendant; that said basket was not left with·defendant at all, but was carried away from defendant's business by said agent of said express company immediately upon the delivery of said packages of cigarettes; that defendant immediately upon his receipt of said packages, as aforesaid, put them on sale, without breaking, and sold one of them on said November 1, 1897, to W. G. Brown, an adult resident of said Monroe County, Tennessee, said sale being in Monroe County, Tennessee, and within one year before the finding of this indictment."

. Upon these facts the Supreme Court of Tennessee sustained the conviction, and thereupon the defendant sued out this writ of error. His contention is that the act is, as applied to the importation of cigarettes and subsequent sale thereof in the packages in which they were imported, in conflict with the Constitution of the United States.

It will be perceived that the statute in terms expressly prohibits the sale of cigarettes, or the bringing them into the State for the purpose of sale. If valid, it not only prohibits an individual within the State from selling cigarettes manufactured therein, but also prohibits any one bringing cigarettes from another State into Tennessee for the purpose of sale. It will, therefore, stop all importations of cigarettes for sale, and the only permissible importations will be those for personal use. The power of the State, therefore, to put an end to commerce between other States and itself, except so far as the importation is for the use of the importer, is broadly and distinctly asserted by this statute. Claiming the right to determine absolutely what shall be sold within its limits, Tennessee attempts to prohibit the sale, or the importation for sale, of cigarettes. As said by its Supreme Court: "The statute under which the conviction was had unconditionally prohibits all sales of cigarettes, whether manufactured in this State or elsewhere."

JUSTICES BREWER, SHIRAS, PECKHAM and the CHIEF JUSTICE, dissenting.

It may be well to consider what this statute is not. It has none of the elements of inspection. It does not attempt to distinguish between cigarettes made of tobacco free from any drug, wrapped in paper untouched by any poison, from those (of which we are assured by counsel in their argument there are many) whose tobacco has been mixed with opium or some other drug, and whose wrapper has been saturated in a solution of arsenic. There is no attempt to distinguish between the pure and impure; no attempt to protect a purchaser from the purchase of an adulterated article. On the contrary, it stamps tobacco wrapped up in the form of a cigarette as in and of itself noxious, and to be wholly forbidden. The Supreme Court of Tennessee rightly interpreted this statute as an absolute prohibition of the sale of cigarettes, no matter what the character of the paper wrappers or the condition of the tobacco within them, and it asserted the power of the State to enact the statute on the ground that cigarettes are "inherently bad, and bad only." I quote from its opinion:

"Are cigarettes legitimate articles of commerce? We think they are not, because wholly noxious and deleterious to health. Their use is always harmful, never beneficial. They possess no virtue, but are inherently bad, and bad only. They find no true commendation for merit or usefulness in any sphere. On the contrary, they are widely condemned as pernicious altogether. Beyond question, their every tendency is toward the impairment of physical health and mental vigor.

"There is no proof in the record as to the character of cigarettes, yet their character is so well and so generally known to be that stated above, that the courts are authorized to take judicial cognizance of the fact. No particular proof is required in regard to those facts which by human observation and experience have become well and generally known to be true, *Schollenberger* v. *Pennsylvania*, 171 U. S. 1; 1 Greenl. Evi. sec. 6; 1 Whart. Evi. sec. 282; 1 Jones' Evi. secs. 129 and 134; *Lanfear* v. *Mestier*, 18 La. Ann. 497; *S. C.*, 89 Am. Dec. 658 and note 693; *State* v. *Goyette*, 11 R. I. 592; *Watson* v. *State*, 55 Ala. 158; nor is it essential that they shall have been formally recorded in written history or science to entitle courts to take

JUSTICES BREWER, SHIRAS, PECKHAM and the CHIEF JUSTICE, dissenting.

judicial notice of them.    *Boullemet* v. *State*, 28 Ala. 83 ;  12 Am.
& Eng. Enc. L. 199.

" It is a part of the history of the organization of the volun-
teer army in the United States during the present year that
large numbers of men, otherwise capable, had rendered them-
selves unfit for service by the use of cigarettes, and that among
the applicants who were addicted to the use of cigarettes more
were rejected by examining physicians on account of disabilities
thus caused than for any other, and perhaps every other reason.

" It is also a part of the unwritten history of the legislation
in question that it was based upon and brought to passage by
the firm conviction of the minds of legislators and of the public
that cigarettes are wholly noxious and deleterious.    The enact-
ment was made upon this idea and alone for the protection of
the people of the State from an unmitigated evil."

No one can question the sincerity of the legislature of Ten-
nessee in thus enacting what it deemed for the health of its
citizens, or the conviction of the members of its Supreme Court
of the validity of such legislation by reason of the greatness of
the supposed evil which it was intended to restrain.    And yet
there is no consensus of opinion as to the fact of such evil.    As
illustrative of which statement see the articles in the Medico-
Legal Journal of March and September, 1898, and the large
collection therein of the opinions of medical and other scientific
gentlemen in respect to the matter.    Further, the report for 1899
of the Commissioner of Internal Revenue (p. 436) shows that
the number of cigarettes manufactured in the United States
during the year 1899 was two billion eight hundred and five
million one hundred and thirty thousand seven hundred and
thirty-seven, (2,805,130,737) on which the government collected
a tax of four million two hundred and thirteen thousand and two
hundred and fifteen dollars and twenty-five cents ($4,213,215.25).
These figures are enormous, and in addition this fact may be
noted, a fact obvious to all who have had occasion to travel in
other countries, (particularly those occupied by different branches
of the Latin race,) that the use of cigarettes is there far more
common than in this country.

In view of these and other facts it is perhaps not surprising

JUSTICES BREWER, SHIRAS, PECKHAM and the CHIEF JUSTICE, dissenting.

to find Mr. Justice Brown, speaking for himself and three associates, stating, "we are not prepared to fully indorse the opinion of that court" (Supreme Court of Tennessee) "that cigarettes are not legitimate articles of commerce," or that "they are inherently bad, and bad only." The truth is that, whatever differences of opinion may exist as to whether cigarettes are or are not hurtful, they are confessedly a common and well recognized article of commerce, and as such when the subject of interstate commerce are under the control of that body to which by the Constitution of the United States is given the power to regulate commerce between the States.

It will be seen by an inspection of the opinion of the Supreme Court of Tennessee that that court sustained the conviction on two grounds: First. That cigarettes were not a legitimate article of commerce, and therefore the State of Tennessee by virtue of its police power had a right to prohibit absolutely their importation and sale, no matter in what form they were so imported and sold; and, secondly, that if it had no such general power it could prohibit the importation and sale of cigarettes in packages of the size in which these were imported and sold. In view of the adherence by Mr. Justice White to the opinions heretofore announced by this court in *Leisy* v. *Hardin*, 135 U. S. 100, and other cases in respect to the inability of the State by virtue of its police power to prohibit the importation and sale in original packages of articles, which are recognized articles of commerce although the subjects of conflicting opinions as to the deleteriousness of their use, it would seem unnecessary to enter into any lengthy consideration of the first ground. Especially is this so inasmuch as there is no expressed attempt to overrule *Schollenberger* v. *Pennsylvania*, 171 U. S. 1, decided two years ago last May, in which decision three of the justices concurring in the affirmance of the judgment herein concurred, and in which it was distinctly ruled (p. 23): "In the absence of congressional legislation, therefore, the right to import a lawful article of commerce from one State to another continues until a sale in the original package in which the article was introduced into the State." Although it may be noticed in passing that this case, as decided by the Supreme Court of

Pennsylvania, where it is reported under the title, *Commonwealth* v. *Paul*, 170 Penn. St. 284, (see 171 U. S. 5,) is both cited and quoted from in support of this decision. A ruling we have reversed is the authority now relied upon. Inasmuch however as Mr. Justice Brown, in his opinion, has, in addition to this citation, quoted some expressions which may seem to tend towards giving an enlarged scope to the police power of the State, it may not be a waste of time to show concisely what this court has decided, and what may, therefore, now be considered settled law.

In the first place, Congress has supreme and exclusive control over interstate commerce. I shall not attempt to restate the oft-repeated historical argument that one of the chief reasons leading to the formation of the Federal Constitution was the necessity, disclosed by the experience of the colonies under the confederation, of preventing any discriminating or retaliatory legislation by any State in respect to the commodities produced or manufactured in another, and the consequent importance of having commerce between the States placed absolutely within the control of a legislative body representing all the States. And yet it may not be out of place to quote these words from the concurring opinion of Mr. Justice Johnson, in *Gibbons* v. *Ogden*, 9 Wheat. 1, 224:.

"For a century the States had submitted, with murmurs, to the commercial restrictions imposed by the parent State; and, now, finding themselves in the unlimited possession of those powers over their own commerce, which they had so long been deprived of and so earnestly coveted, that selfish principle which, well controlled, is so salutary, and which, unrestricted, is so unjust and tyrannical, guided by inexperience and jealousy, began to show itself in iniquitous laws and impolitic measures, from which grew up a conflict of commercial regulations, destructive to the harmony of the States, and fatal to their commercial interests abroad. This was the immediate cause that led to the forming of a convention."

And these from Chief Justice Marshall, in *Brown* v. *Maryland*, 12 Wheat. 419, 446:

"It may be doubted whether any of the evils proceeding

from the feebleness of the Federal government contributed more to the great revolution which introduced the present system than the deep and general conviction that commerce ought to be regulated by Congress. It is not, therefore, matter of surprise that the grant should be as extensive as the mischief, and should comprehend all foreign commerce and all commerce among the States."

The plain language of the Constitution affirms this. Second only to the power " to collect taxes " and " to borrow money " is the power given to Congress by section 8, article 1, of the Constitution " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." Thus next in order, as though next in importance to the power of maintaining itself by taxation and borrowing money, is the power to regulate commerce between the States as well as between the United States and foreign nations.

While this nation is as between it and the States one of enumerated powers, it is within the scope of those enumerated powers supreme, and, as the power to regulate commerce between the States is expressly given to Congress, and no division provided for, it follows that it is wholly withdrawn from state control; and such has been the uniform ruling of this court. In the case just quoted from, *Gibbons* v. *Ogden*, Chief Justice Marshall, delivering the opinion of the court, on page 196, thus declared the scope and limit of that power :

" It is the power to regulate ; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. These are expressed in plain terms, and do not affect the questions which arise in this case, or which have been discussed at the bar. If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several States, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restric-

tions on the exercise of the power as are found in the Constitution of the United States."

And in the other case referred to, *Brown* v. *Maryland*, on page 446, the Chief Justice put this question and gave this answer:

"What, then, is the just extent of a power to regulate commerce with foreign nations, and among the several States?

"This question was considered in the case of *Gibbons* v. *Ogden*, 9 Wheat. 1, in which it was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the Constitution. The power is coextensive with the subject on which it acts, and cannot be stopped at the external boundary of a State, but must enter its interior."

In *The Passenger Cases*, 7 How. 283, Mr. Justice McLean, after referring to many prior cases, to the discussions in the convention which formed the Constitution, and the language, among others, of Mr. Madison in that discussion, that "he was more and more convinced that the regulation of commerce was in its nature indivisible, and ought to be wholly under one authority," summed up his conclusion in these words (p. 400):

"Whether I consider the nature and object of the commercial power, the class of powers with which it is placed, the decision of this court in the case of *Gibbons* v. *Ogden*, 9 Wheat. 1, reiterated in *Brown* v. *Maryland*, 12 Wheat. 419, and often reasserted by Mr. Justice Story, who participated in those decisions, I am brought to the conclusion that the power 'to regulate commerce with foreign nations, and among the several States,' by the Constitution, is exclusively vested in Congress."

In *The Head Money Cases*, 112 U. S. 580, 590, Mr. Justice Miller, considering a statute passed by Congress requiring the master or owner of every vessel bringing immigrants into the United States to pay a tax of fifty cents for each immigrant, to create a fund for the expense of regulating immigration, the care of immigrants and for the relief of such as were in distress, and holding that it constituted a regulation of commerce, said in reference to it and other like statutes:

"That the purpose of these statutes is humane, is highly beneficial to the poor and helpless immigrant, and is essential to the

protection of the people in whose midst they are deposited by the steamships, is beyond dispute. That the power to pass such laws should exist in some legislative body in this country is equally clear. This court has decided distinctly and frequently, and always after a full hearing from able counsel, that it does not belong to the States. That decision did not rest in any case on the ground that the State and its people were not deeply interested in the existence and enforcement of such laws, and were not capable of enforcing them if they had the power to enact them; but on the ground that the Constitution, in the division of powers which it declares between the States and the general government, has conferred this power on the latter to the exclusion of the former."

In *Leisy* v. *Hardin*, 135 U. S. 100, 108, Chief Justice Fuller thus stated the rule:

" The power vested in Congress ' to regulate commerce with foreign nations, and among the several States, and with the Indian tribes,' is the power to prescribe the rule by which their commerce is to be governed, and is a power complete in itself, acknowledging no limitations other than those prescribed in the Constitution. It is coextensive with the subject on which it acts, and cannot be stopped at the external boundary of a State, but must enter its interior, and must be capable of authorizing the disposition of those articles which it introduces, so that they may become mingled with the common mass of property within the territory entered."

I might multiply quotations like these, but it is unnecessary. See the following among other cases for like affirmations: *United States* v. *Coombs*, 12 Pet. 72, 78; *Case of the State Freight Tax*, 15 Wall. 232, 279, 281; *Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 96 U. S. 1, 9, 10; *Mobile County* v. *Kimball*, 102 U. S. 691, 696, 697, 699, 700, 702; *Webber* v. *Virginia*, 103 U. S. 344, 351; *Telegraph Company* v. *Texas*, 105 U. S. 460, 466; *People* v. *Compagnie Generale Transatlantique*, 107 U. S. 59, 60; *Moran* v. *New Orleans*, 112 U. S. 69, 72, 73; *Gloucester Ferry Company* v. *Pennsylvania*, 114 U. S. 196, 204, 211; *Brown* v. *Houston*, 114 U. S. 622, 630, 631, 632; *Philadelphia*

& *Southern Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, 336; *In re Rahrer*, 140 U. S. 545, 554, 555.

The power of Congress to regulate commerce between the States being, as we have seen, supreme, its failure to impose any restrictions or regulations is to be taken as a declaration that, in its judgment, such commerce shall be free. There is no necessity of an affirmative declaration on its part, for, as it alone has power to restrict or prescribe regulations, its failure to do so leaves the commerce unburdened. This, too, is a proposition which has been so often declared by this court as to be one of the settled rules of constitutional law. Thus, in *Welton* v. *Missouri*, 91 U. S. 275, 282, it was said:

"The fact that Congress has not seen fit to prescribe any specific rules to govern interstate commerce, does not affect the question. Its inaction on this subject, when considered with reference to its legislation with respect to foreign commerce, is equivalent to a declaration that interstate commerce shall be free and untrammeled."

In *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 493, Mr. Justice Bradley summed up the matter in these words and with these citations:

"Another established doctrine of this court is, that where the power of Congress to regulate is exclusive the failure of Congress to make express regulations indicates its will that the subject shall be left free from any restrictions or impositions; and any regulation of the subject by the States, except in matters of local concern only, as hereafter mentioned, is repugnant to such freedom. This was held by Mr. Justice Johnson in *Gibbons* v. *Ogden*, 9 Wheat. 1, 222; by Mr. Justice Grier in *The Passenger Cases*, 7 How. 283, 462; and has been affirmed in subsequent cases. *State Freight Tax Cases*, 15 Wall. 232, 279; *Railroad Co.* v. *Husen*, 95 U. S. 465, 469; *Welton* v. *Missouri*, 91 U. S. 275, 282; *Mobile* v. *Kimball*, 102 U. S. 691, 697; *Brown* v. *Houston*, 114 U. S. 622, 631; *Walling* v. *Michigan*, 116 U. S. 446, 455; *Pickard* v. *Pullman Southern Car Co.*, 117 U. S. 34; *Wabash &c. Ry. Co.* v. *Illinois*, 118 U. S. 557."

See also *Bowman* v. *Chicago & Northwestern Ry. Co.*, 125

JUSTICES BREWER, SHIRAS, PECKHAM and the CHIEF JUSTICE, dissenting.

U. S. 465; *Leisy* v. *Hardin, supra; Covington &c. Bridge Co.* v. *Kentucky,* 154 U. S. 204.

In this case the words of Mr. Justice Brown were, (page 212):

"But wherever such laws, instead of being of a local nature and not affecting interstate commerce but incidentally, are national in their character, the non-action of Congress indicates its will that such commerce shall be free and untrammeled."

It is true there are many cases in this court in which have been sustained acts of a State which do in a measure affect interstate commerce, but the thought underlying those cases has been that the acts complained of were not direct regulations of interstate commerce, not in restriction but in furtherance of it, and being purely local in character might rightfully be upheld until Congress should by its legislation direct the contrary.

That the transportation from one State of its products into another State for purposes of sale is not a matter of purely local interest to the latter State is evident. It concerns the right of the producer or manufacturer in the former State to his market. We are told by the learned attorney general of Tennessee, as an evidence of the good faith of the State in this legislation, that it has many areas of territory especially valuable for the growth of tobacco, and that it is one of the large tobacco producing States in the nation. That is, therefore, a valuable industry in Tennessee. Suppose the legislatures of all the other States should become possessed of the idea that the use of tobacco was injurious, and prohibit the importation and sale thereof. Could it fairly be said that such legislation was in respect to a matter of only local interest in the separate States passing such legislation? Could not Tennessee rightfully contend that it was a matter affecting one of its large industries, and which was likely to be destroyed by such adverse legislation?

It is undoubtedly true that the police power is not by the Constitution delegated to Congress. It may, therefore, under article 10 of the Amendments, be regarded as reserved to the States respectively, or to the people, but it is equally clear that no power which is impliedly reserved to the States can limit or detract from the full scope of any power expressly delegated

to the nation, to be exercised by Congress. In other words, the State cannot in the exercise of the police power interfere with the supreme control by Congress over interstate commerce. This has been repeatedly affirmed by this court. In *Henderson* v. *New York City*, 92 U. S. 259, 271, it was said by Mr. Justice Miller :

"This power, frequently referred to in the decisions of this court, has been, in general terms, somewhat loosely called the police power. It is not necessary for the course of this discussion to attempt to define it more accurately than it has been defined already. It is not necessary, because whatever may be the nature and extent of that power, where not otherwise restricted, no definition of it, and no urgency for its use, can authorize a State to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of Congress by the Constitution."

In *Railroad Company* v. *Husen*, 95 U. S. 465, 471, 472, it was said by Mr. Justice Strong:

"But whatever may be the nature and reach of the police power of a State, it cannot be exercised over a subject confided exclusively to Congress by the Federal Constitution. It cannot invade the domain of the national government. . . . It may not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or interstate commerce."

Again, by Mr. Justice Harlan, in *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 661 :

"Definitions of the police power must, however, be taken, subject to the condition that the State cannot, in its exercise, for any purpose whatever, encroach upon the powers of the General Government, or rights granted or secured by the supreme law of the land."

Again, in reference to quarantine laws, by Mr. Justice Miller, in *Morgan Steamship Co.* v. *Louisiana*, 118 U. S. 455, 464 :

"For, while it may be a police power in the sense that all provisions for the health, comfort and security of the citizens are police regulations, and an exercise of the police power, it has been said more than once in this court that, where such

powers are so exercised as to come within the domain of Federal authority as defined by the Constitution, the latter must prevail. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210; *Henderson* v. *The Mayor*, 92 U. S. 259, 272; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 661."

Further may well be quoted the words of Mr. Justice Catron in the *License Cases*, 5 How. 504, 599, quoted with approval in *Bowman* v. *Chicago & Northwestern Railway*, 125 U. S. 465, 489, and again referred to with like approval in *Leisy* v. *Hardin*, 135 U. S. 100, 113, and also in *In re Rahrer*, 140 U. S. 545, 557:

"The assumption is that the police power was not touched by the Constitution, but left to the States, as the Constitution found it. This is admitted; and whenever a thing, from character or condition, is of a description to be regulated by that power in the State, then the regulation may be made by the State, and Congress cannot interfere. But this must always depend on facts subject to legal ascertainment, so that the injured may have redress. And the fact must find its support in this, whether the prohibited article belongs to and is subject to be regulated as part of foreign commerce, or of commerce among the States. If, from its nature, it does not belong to commerce, or if its condition from putrescence or other cause, is such, when it is about to enter the State, that it no longer belongs to commerce, or, in other words, is not a commercial article, then the state power may exclude its introduction. And as an incident to this power, a State may use means to ascertain the fact. And here is the limit between the sovereign power of the State and the Federal power, that is to say, that which does not belong to commerce is within the jurisdiction of the police power of the State; and that which does belong to commerce is within the jurisdiction of the United States. And to this limit must all the general views come, as I suppose, that were suggested in the reasoning of this court in the cases of *Gibbons* v. *Ogden*, *Brown* v. *The State of Maryland* and *New York* v. *Miln*. What, then, is the assumption of the state court? Undoubtedly, in effect, that the State had the power to declare what should be an article of lawful commerce in the particular

State; and having declared that ardent spirits and wines were deleterious to morals and health, they ceased to be commercial commodities there, and that then the police power attached, and consequently the powers of Congress could not interfere. The exclusive state power is made to rest, not on the fact of the state or condition of the article, nor that it is property usually passing by sale from hand to hand, but on the declaration found in the state laws, and asserted as the state policy, that it shall be excluded from commerce. And by this means the sovereign jurisdiction in the State is attempted to be created in a case where it did not previously exist. If this be the true construction of the constitutional provision, then the paramount power of Congress to regulate commerce is subject to a very material limitation; for it takes from Congress, and leaves with the States, the power to determine the commodities, or articles of property, which are the subjects of lawful commerce. Congress may regulate, but the States determine what shall or shall not be regulated. Upon this theory the power to regulate commerce, instead of being paramount over the subject, would become subordinate to the state police power; for it is obvious that the power to determine the articles which may be the subjects of commerce, and thus to circumscribe its scope and operation, is, in effect, the controlling one. The police power would not only be a formidable rival, but, in a struggle, must necessarily triumph over the commercial power, as the power to regulate is dependent upon the power to fix and determine upon the subjects to be regulated."

See also *Minnesota* v. *Barber*, 136 U. S. 313; *Brimmer* v. *Rebman*, 138 U. S. 78; *Crutcher* v. *Kentucky*, 141 U. S. 47; *Voight* v. *Wright*, 141 U. S. 62; *Gulf, Colorado & Santa Fé Railway* v. *Hefley*, 158 U. S. 98.

We have thus, first, the express language of the Constitution delegating to Congress the power " to regulate commerce . . . among the several States;" second, the repeated rulings of this court that that power is supreme and exclusive; third, an equal volume of decision that the failure of Congress to prescribe any limitations to interstate commerce in respect to any particular article is equivalent to a declaration by that

body that it intends that such commerce shall be free; and, fourth, the equally often repeated ruling that the reserved police power of the States is subordinate to and does not limit or take from the supreme control by Congress over matters of interstate commerce.

It would seem from this concurrence of rulings that the decision in *Leisy* v. *Hardin*, *supra*, had now become the settled law, and that henceforth it is not to be questioned; that no State can, under the guise of a police regulation, directly restrain the importation and sale of articles brought in from other countries and other States, which are recognized articles of commerce, no matter what may be the local opinion as to the injurious effects of the use of such articles. The opinion of the Supreme Court of Tennessee on the first proposition suggested must, therefore, be considered as definitely overruled.

I pass now to the second proposition, which is that the packages in which these cigarettes were imported are so small, or the manner of their importation so peculiar, that the power of Congress over interstate commerce is as to them lost and the power of the State has become controlling. That this is the question upon which alone the reversal is ordered is evident, for it is said by Mr. Justice Brown, in his opinion, after referring to the matter of the police power:

"We are remitted to the inquiry whether a paper package of three inches in length and one and a half inches in width, containing ten cigarettes, is an original package protected by the Constitution of the United States against any interference by the State while in the hands of the importer? This we regard as the vital question in the case."

And by Mr. Justice White, in his concurring opinion:

"Indeed, as I understand the case as now decided, all the questions adverted to are merged in the solution of the one decisive issue, which is: Was each particular parcel of cigarettes an original package within the constitutional import of those words as defined by the previous adjudications of the court?"

I come to the consideration of this question with the conceded fact that Congress has supreme and exclusive control over interstate commerce; that no State in the exercise of its police power

can directly restrain such commerce; and inquire why the size of the package or the manner of importation determines the limit of national control?

And first as to the matter of size, we are told that the cigarette package is three inches in length and one and a half inches in width, and contains ten cigarettes. I have no doubt of the accuracy of this measurement, but I in vain search the Constitution of the United States for any intimation that the power of Congress over interstate commerce ceases when the packages in which that commerce is carried on are of any particular size. Mr. Justice Brown quotes this language of Chief Justice Marshall, in *Brown* v. *Maryland*, 12 Wheat. 419, wherein, having adverted to the fact that the importer might after the importation so break up the packages, or so handle the goods, as to show an intent to incorporate them into the mass of the general property of the State, he says:

"It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has perhaps lost its distinctive character as an import, and has become subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution."

And upon this quotation this observation is made:

"This sentence contains in a nutshell the whole doctrine upon the subject of original packages, upon which so formidable a structure has been attempted to be erected in subsequent cases."

And yet, curiously enough, after this declaration, although the cigarettes sold by the defendant were "in the original form or package in which they were imported," although there had been no breaking of any package, it is held that the power of the nation does not protect him in that sale. Necessarily, there is impliedly added to the language of the Chief Justice words like these, "provided such package be of considerable size, at least larger than three inches in length and one and a half inches in width." Of all the justices of this court, Chief Justice Mar-

JUSTICES BREWER, SHIRAS, PECKHAM and the CHIEF JUSTICE, dissenting.

shall has hitherto been credited with marvelous accuracy of statement, but it would seem from the construction now given that he omitted a most important particular in defining the relative powers of the nation and the State. Even now there is a singular failure to give the size of the package which takes the importation out of the power of Congress and entrusts it to the control of the State. Recently, in *Schollenberger* v. *Pennsylvania*, 171 U. S. 1, we held that an importer had a right to import oleomargarine in ten-pound packages, and sell it in such a package at retail to a consumer. Apparently, the dividing line as to the size of packages must be somewhere between that of a ten-pound package of oleomargarine and that of a package of ten cigarettes; but where? Must diamonds, in order to be within the protecting power of the nation, be carried from State to State in ten-pound packages?

If it be said that diamonds are not a subject of police regulation, and that a different rule obtains in reference to them than to matters of police regulation, (as might be implied from the scope of the opinion,) I can only say that the conclusion seems to me strange. Concretely, it amounts to this: The police power of the State, the power exercised to preserve the health and morals of its citizens, may prevent the importation and sale of a pint of whiskey, but cannot prevent the importation and sale of a barrel; or, in other words, the greater the wrong which is supposed to be done to the morals and health of the community, the less the power of the State to prevent it. That may be constitutional law, but to my mind it lacks the saving element of common sense. I see no logical half way place between a recognition of the power of the nation to regulate commerce between the States in all things which are the subjects of commerce (in whatever form or manner they may be imported) and a concession of the power of the State to prevent absolutely the importation and sale of articles deemed by it prejudicial to the health or morals of its citizens. Either the State has, in the exercise of its police power, the right to prohibit the importation and sale of articles deemed by it injurious to the health and morals of the community—no matter in what size or form of package the importation is made—or else it has no

such power, and the determination of the question of importation and sale is one to be left to Congress. The attitude of one who affirms the supreme power of the Nation over interstate commerce, including therein the right of Congress to regulate the importation and sale in large packages of things whether or not deemed by any State deleterious in their use, and yet holds that that supreme power of Congress is exhausted the moment the importation is in a package of small size, finds something of a parallel in the attitude of the citizen of a State, which has adopted prohibition, who upholds the law, but objects to its enforcement.

The size of the package seems to be the troublesome matter in the minds of some of my brethren. Let me put that question of size to this test. Suppose Congress, assuming that it had power over interstate commerce, should enact that all transportation of cigarettes between States should be in packages of ten cigarettes each, would that be a regulation of interstate commerce? Or would my brethren say that that was beyond the power of Congress? The power of Congress over commerce between the States is given in the same section and in the same language as its power over commerce between this Nation and foreign nations. Is this court prepared to say that, if Congress should enact that no importations of cigarettes from abroad should be otherwise than in packages of ten cigarettes each, such legislation was beyond its power because it affected a package of a small size? Mr. Justice White, evidently appreciating the logic of these suggestions, escapes their force by this declaration, and I quote from his opinion that which succeeds the quotation heretofore made:

"I am constrained to conclude that this question is correctly answered in the negative, not only from the size of each particular parcel, but from all the other surrounding facts and circumstances, among which may be mentioned the trifling value of each parcel, the absence of an address on each, and the fact that many parcels, for the purpose of commercial shipment, were aggregated, thrown into and carried in an open basket. Thus associated in their shipment, they could not, under all the

facts and circumstances of the case, after arrival be segregated so as to cause each to become an original package."

I regret that the decision of a great constitutional question like that here presented turns on the shifting opinions of individual judges as to the peculiar facts of a particular case. No one can tell from this annunciation where is the dividing line between the power of the State and the power of the nation. Obviously the mere size of the package does not in this view determine. It would seem that constitutional limitations should be stated by the courts with precision. I think, and I say it with all respect, that no case involving a constitutional question should be turned off on the simple declaration that upon its peculiar facts it falls on one side or the other of some undisclosed line of demarcation. It seems to me, and yet I speak hesitatingly, in view of the indefiniteness of his declarations, that Mr. Justice White thinks there was something in the conduct of this importer in evasion of the state statute. But can any statute be deemed to be evaded which has no application to the particular matter? If the regulation of interstate commerce is a matter within the sole jurisdiction of Congress, surely no act of the State restraining an importation and sale can have any application thereto. If the State may not say whether the importation shall be in large or small packages, if that is a regulation of interstate commerce within the sole power of the United States, then no act of the importer in fixing the size of the package can be adjudged either in conflict with or an evasion of any state statute. There is but one of two alternatives. Either the State may regulate the size of the package or Congress has the power. If a State has the right, then of course it may prevent the importation of packages other than those of a large size; but if Congress alone can regulate it, then the State has nothing to do with the question of the size of the package, and no act of the importer in fixing the size of the package can be adjudged in conflict with its statute.

Congress has prescribed the sizes of the packages in which cigarettes are to be put up, and while it is true, as indicated in *Plumley* v. *Massachusetts*, 155 U. S. 461, that the primary purpose of such legislation is the collection of internal revenue

taxes, and not the regulation of commerce between the States, yet it is also true that.it is not within the power of the States to declare that the use of packages of the size prescribed by Congress is illegitimate.   There cannot be imputed to Congress the purpose to in any way interfere with the full power of the States over matters committed to their care, nor can the use by an individual of packages such as Congress has authorized be condemned as an evasion of state laws.   The use of such a package legitimate for one purpose is legitimate for others, and a State by its statutes cannot in any way nullify or weaken the effect of congressional enactment.   So, although these packages are small in size, they have the approbation of Congress and must be considered as legal, and their use cannot be made illegal by state laws.

And here it is well to refer to the language of Chief Justice Marshall, quoted, *supra*.   It is: " In the original form or package in which it was imported."   Not in which " it might have been ".or " ought to have been imported."   Obviously, it did not occur to him that the form or package which the importer might adopt in any way affected the power of Congress over the importation.   One will search the opinion of the Chief Justice in vain to ascertain the size or form of the package then before the court.   If Congress should see fit to describe a form or package, it was within its power.   If it did not do so, it left the matter to the determination of the importer.   There seems to be in the minds of those of my brethren with whom I differ the thought that, because this importer did not import in a customary way, the control of Congress in the matter ceased. The cost of transporting a single package of cigarettes from the manufactory in Durham, N. C., to any part of Tennessee may be great, and therefore such transportation is not ordinarily undertaken.   It may be true, and undoubtedly is true, that a manufacturer of yeast cakes in the city of New York would not feel warranted in going to the expense of shipping a single yeast cake, or, for that matter, a hundred, to Covington, Ky., and yet that same individual, if he had a manufactory in Cincinnati, might find that the most convenient and inexpensive way of filling orders from Covington was to send them in sep-

JUSTICES BREWER, SHIRAS, PECKHAM and the CHIEF JUSTICE, dissenting.

arate packages in his delivery wagons across the bridge from the one city to the other. In each case the transportation would be one of interstate commerce, and it cannot be possible that Congress has the power to regulate the transportation from New York to Covington and not that from Cincinnati to Covington.

Another matter which must not be ignored in measuring the control of Congress over interstate commerce is the changes in the modes of transportation. At the time that Chief Justice Marshall wrote the opinion in *Brown* v. *Maryland* transportation was carried on by water in sailing vessels and by land largely in lumber wagons. It is not strange that at such time all transportation was of goods packed in large boxes, securely fastened to prevent accidents from the rough and tumble way of transportation. There were then no express companies for carrying small packages. All that mode of transportation has grown up in this country within the last sixty years, but the express companies carrying their small packages from State to State are just as certainly engaged in interstate commerce as the old-fashioned lumber wagons carrying commodities between the same places. The facilities of transportation are increasing rapidly, and with them the cost of such transportation is diminishing, so that more and more will it be true that the smallest packages will be the frequent subject of transportation, even between State and State. But it has often been said that the grants of power in the Constitution to the national government were expressed in such broad and general language that, notwithstanding the many changes in the modes of doing business, in the forms and conditions of social life, the needed control was still found to be vested in Congress. Can it be that an exception to this rule is now to arise in the matter of the full and complete power given by that instrument to Congress over interstate commerce?

Again, let me go back to the opinion of Chief Justice Marshall, and quote pages 439–446 :

" There is no difference, in effect, between a power to prohibit the sale of an article, and a power to prohibit its introduction into the country. The one would be a necessary consequence

of the other. No goods would be imported if none could be sold.

\* \* \* \* \* \* \* \*

" If this power reaches the interior of a State, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse; one of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell."

Now, if cigarettes cannot be brought into the State of Tennessee and sold in the packages in which they were manufactured, but must be brought in and sold only in barrels or boxes of large size, the right of importation is practically defeated, for no consumer would buy a barrel or box for his own use, and no importer could sell it to a second party with the idea of a resale, because the moment the first sale is accomplished, the law of the State interposes to prevent the second. In other words, this contention that an imported package must be of a large size in order to secure the right of sale is simply a convenient way of declaring that the right of importation for purposes of sale may be denied. Not such was the thought of this court, as expressed in the opinion of Chief Justice Marshall. The idea then was that the right of sale was an incident to the right to import; that the State could neither directly forbid the importation, nor indirectly prevent it by embarrassing the right of sale with restrictions which, in fact, stop all importation for purposes of sale.

JUSTICES BREWER, SHIRAS, PECKHAM and the CHIEF JUSTICE, dissenting.

I do not doubt that the importation and sale of many things may wisely be restrained, but the question is as to the body by which such regulations shall be made. We may all agree that the importation and sale of liquors should be restrained or prohibited. We may doubt as to whether a like rule obtains as to the importation and sale of oleomargarine. Believing that the settled ruling of this court has been that that question is one to be determined by Congress, I think that this decision is a plain departure therefrom.

Nor is there reason to apprehend that any unfortunate results will flow from the supreme power of Congress in the matter. Take the case of intoxicating liquors. When it was found by the decision in *Leisy* v. *Hardin, supra,* that interstate commerce in such liquors (they being recognized articles of commerce) could not be regulated by the States, Congress promptly passed an act providing that liquors imported into any State should upon arrival therein be subject to the local laws, 26 Stat. 313, c. 728, the validity of which legislation was sustained in *In re Rahrer,* 140 U. S. 545. So it cannot be doubted that if that body which represents all the States shall be of opinion that the use of any particular article is freighted with injury to public health, morals or safety, it will absolutely prohibit interstate commerce therein, or if in its judgment (as in the case of intoxicating liquors) there is in certain localities such a feeling in reference to any article that commerce therein may wisely be regulated by the State, it will provide therefor. Although some temporary disadvantage or inconvenience may result from this assertion of the supremacy of Congress, it is not fitting, in view of the constitutional provisions, to ignore or limit the full scope of that supremacy; and, it may properly be added, it is better that in certain instances one State should be subjected to temporary annoyance rather than that the whole framework of commercial unity created by the Constitution should be destroyed by relegating to each State the determination of what particular articles it will permit to be imported into its borders.

" The power cannot be conceded to a State to exclude, directly or indirectly, the subjects of interstate commerce, or, by the imposition of burdens thereon, to regulate such com-

merce, without congressional permission.   The same rule that applies to the sugar of Louisiana, the cotton of South Carolina, the wines of California, the hops of Washington, the tobacco of Maryland and Connecticut, or the products, natural or manufactured, of any State, applies to all commodities in which a right of traffic exists, recognized by the laws of Congress, the decisions of courts, and the usages of the commercial world. It devolves on Congress to indicate such exceptions as in its judgment a wise discretion may demand under particular circumstances." *Lyng* v. *Michigan,* 135 U. S. 161, 166.

For these reasons I dissent from the opinions and judgment in this case.

I am authorized to say that the CHIEF JUSTICE, MR. JUSTICE SHIRAS and MR. JUSTICE PECKHAM concur in this dissent.