THE STATE OF KANSAS, *Appellant*, V. M. KIRMEYER, *Appellee*.

No. 18,396.

SYLLABUS BY THE COURT.

1. BASIC FACTS—*Conflicting Conclusions Deduced Therefrom—Error.* A finding consisting only of conclusions from basic facts found in detail can not be upheld where it is in conflict with them. The basic facts must prevail over the conclusion.

2. INTOXICATING LIQUORS — *Interstate Commerce — Question of Fact.* Where the commerce clause of the federal consititution is invoked as a protection to traffic in intoxicating liquor, the courts are not precluded from an inquiry into methods and practices to determine whether the transactions involved constitute legitimate interstate commerce; or are colorable merely and intended to evade and defeat the just operation of the constitution and laws of this state.

3. —— *"Shifts and Devices"—Crossing State Line.* A citizen of this state whose business is prohibited here can not, under the guise of moving his stock in trade across the state line and other shifts or devices to evade the statutes of the state continue the prohibited business here and be immune from the penalties of our law.

Appeal from Leavenworth district court. Opinion filed January 11, 1913. Reversed.

*John S. Dawson,* attorney-general, *S. M. Brewster,* special assistant attorney-general, *Lee Bond,* county attorney, and *Arthur M. Jackson,* of Leavenworth, for the appellant.

*A. E. Dempsey,* and *F. P. Fitzwilliam,* both of Leavenworth, for the appellee.

STATEMENT.

This appeal is from a judgment for the defendant in an action prosecuted by the attorney general and county attorney to abate and enjoin a public nuisance. The petition charges a nuisance committed by the defendant in the open and persistent violation of the prohibitory liquor laws. The petition contains the same

averments as those held to be sufficient in *The State v. Rabinowitz,* 85 Kan. 841, 118 Pac. 1040, and also the following:

"Plaintiff further alleges that for several months prior to the institution of this action the said defendant has kept and maintained, and does still keep and maintain, in the city and county of Leavenworth, certain warehouses or storerooms for the purpose of selling and storing intoxicating liquors therein, and for the purpose of storing empty cases, bottles and barrels, and for the purpose of the stabling of wagons loaded with intoxicating liquors, and for the purpose of stabling teams and caring for the same, used in the transportation of intoxicating liquors from said town of Stillings, in the county of Platte, in the state of Missouri, and your petitioners are informed and believe that the said defendant so keeps and maintains said warehouses or storeroom on premises known as No. 117 and No. 117½ Delaware street, in the city of Leavenworth, Kansas."

The prayer is:

"That he (the defendant) be enjoined from conducting said unlawful business; that he be enjoined from maintaining, using and employing said wagons, vehicles, conveyances, horses, mules, telephones and any other property in the said unlawful manner herein alleged; that upon the final determination of this action said injunction be made permanent; that said wagons, vehicles, conveyances, horses, mules, telephones and other property used in said unlawful business be declared common nuisances and that the same be abated."

Findings of fact were made too lengthy for insertion here. The material facts found and stated by the district court are as follows: The defendant is a resident of Leavenworth and a dealer in beer, in which business he has been engaged for many years. Before the year 1907 his place of business, warehouse and barn were in the city of Leavenworth. About that date he moved his place of business to Stillings, Mo., one and one-half miles from Leavenworth, where he has ever since kept an office and warehouse, where he receives beer in

car load lots. He pays a revenue tax to the federal government, a merchant's tax in Missouri and taxes upon his property located in that state. He has no license to sell liquor in this state. His office in Stillings is connected with the telephone exchange in Leavenworth. He receives orders there by mail and telephones for beer, which, if accepted, he fills by tagging the cases, kegs or casks with the names of the persons giving the orders, and deliveries are then made in the original packages by his own teams and wagons or by deliverymen. About 85 per cent of the orders from persons residing in Leavenworth are by telephone, and his trade in that city amounts to about $500 per month. Orders from persons in other places are filled by tagging and hauling the beer to the railroad depot in Leavenworth, and bills of lading are given from that point. There is a freight depot, but no station agent, at Stillings, and no post office. Some beer is received by him at the station in Leavenworth and hauled therefrom by his teams to the Stillings warehouse. The defendant's drivers do not solicit orders or make collections. The defendant makes collections, usually in person, or by collector, and some payments are made by mail. He does a family trade in Leavenworth, selling beer only for private use. When he moved his place of business to Missouri he moved his teams and wagons theretofore used in the business from another place in the city to 117 Delaware street, Leavenworth, and installed telephones there, numbered 313, which he still maintains. Occasionally orders for beer are given over such telephones to No. 117 Delaware street, but are answered by requesting that the place of business at Stillings be called up. Mail orders are also occasionally addressed to the defendant at Leavenworth, but are either taken or sent by him to his place of business at Stillings before being opened. Ever since he became engaged in

the business the defendant has carried advertisements in two newspapers in Leavenworth, reading:

"MICHAEL KIRMEYER
Stillings, Missouri.
ROCHESTER BEER
Family Trade Especially.
Phones 313."

The telephone numbers were not changed through oversight when he changed his place of business to Missouri. In making deliveries from the Stillings warehouse and at the Leavenworth depot his wagons use the Missouri river bridge and the streets and alleys of the city of Leavenworth. The teams and wagons stand upon these streets while deliveries of beer ordered and tagged as before stated are being made.

The following finding was also made:

"The defendant's residence in the city of Leavenworth, Kansas, and the keeping by him of his teams and wagons used by him in his said business, in said city, is not intended as a subterfuge or a shift or device on his part to circumvent or defeat the prohibitory laws of the state of Kansas. Neither is the fact that mail is occasionally addressed to him at Leavenworth, Kansas, instead of Stillings, Missouri, nor the fact that he maintains telephones at his stables in the city of Leavenworth, Kansas, and advertises in said papers above mentioned, intended by him as a shift, and none of these circumstances actually tend to circumvent or defeat the laws of the state of Kansas."

The testimony of the defendant further shows that he has resided in Leavenworth thirty years, and has been in the liquor business "off and on" since he was old enough. About four or five years before the trial, when receivers in cases pending in this court against several brewing companies came to Leavenworth, he "moved across" to Stillings. Stillings contains one store, a round-house and ten or fifteen residences and eight or ten beer warehouses. Occasionally beer is shipped to the defendant over a railroad, consigned to Leavenworth. This beer is hauled in defendant's wagons from

the depot in Leavenworth to his warehouse in Stillings. Deliveries by wagon are only made in Leavenworth. Empties from the Leavenworth trade are all gathered up by the· drivers, hauled to and shipped from the Leavenworth depot to a brewery in Kansas City, Mo., without being taken to Stillings. Sometimes empties are kept in the barn at No. 117 Delaware street over night where the wagons and teams are kept for making deliveries.

To further indicate the nature of the defendant's business we quote from his testimony:

"Before I moved across I received my liquors here in Leavenworth. I have been receiving my liquors at Stillings since I moved across. There is a freight depot at Stillings, but no agent there. I am a dealer in a beer known as Rochester beer. It comes from Kansas City, Mo. That is the only beer I handle. Nearly all of it comes to Stillings in carload lots. I handle nothing but beer. The beer comes to me in regular beer cases, barrels and kegs. Some of· the cars come to me over the Burlington and some over the Chicago Great Western. Some of it comes over the Missouri Pacific. Where it comes over the Missouri Pacific it is unloaded at the freight depot in Leavenworth and I haul it across the river in my own wagons. I do not deliver any from the Missouri Pacific depot in Leavenworth. When I get an order for beer from Oskaloosa, Topeka and other points in Kansas I bring the beer over to the freight depots ·in Leavenworth, Kan., in my own wagons and ship it out from there. I do this because there is no freight agent at Stillings, Mo. Leavenworth is the only place to load it. Ever since I have been doing business at Stillings I have had stables and a warehouse at No 117 and 117½ Delaware street, in Leavenworth, Kan. I keep my horses and wagons there. I have quite a few wagons there. These horses and wagons belong to me. I have both Leavenworth telephones at Stillings, Mo. The numbers of these phones are 54 on the Bell and 101 on the Peoples. I have both phones at my stables, at No. 117 and 117½ Delaware street, in Leavenworth. Both of these phones have the same number. It is 313. I also have a telephone at my home

in Leavenworth. I receive my orders for beer at Stillings, some by letter and some by phone. There is no post office at Stillings. I get my mail in Leavenworth, but I do not open up my beer orders there. I either remail them to Stillings or take them over there before opening them. I open up personal letters in Leavenworth.

"Q. What per cent of your orders for beer from Leavenworth, Kan., do you receive by mail? A. Well, we do not get but about 15 per cent.

"Q. Then 85 per cent from Leavenworth are telephone orders? A. Yes, sir. My telephones are all connected directly with 'central' at Leavenworth. I pay no toll except my monthly bill.

"Q. The same as any other telephone. Now, Mr. Kirmeyer, you receive orders for beer at No. 117 Delaware street, do you not? A. Why, once in a while. We tell them to call up the other number. . . .

"Once in a while a driver lays off or there is a rush, and then I hire a wagon to deliver for me. I pay them. My wagons usually come over once a day. Sometimes we fill special orders. If customers are in a rush we accommodate them. I can not name any customer who is charged for delivering beer to him. I can not remember a single case in which I have made any charge for delivery. My drivers are not supposed to take orders for beer as they go round to make deliveries. They do not do this that I know of. Most of my trade in Leavenworth is what is called 'family trade.' My drivers deliver the beer at residences. When the order is received at Stillings over the telephone the name of the party is put on a tag or label, this is either given to the driver or put on a case of beer in the warehouse at Stillings and then my drivers haul the cases across the Missouri river and deliver them. We use the streets and alleys of Leavenworth in making these deliveries. . . .

"My drivers take up the empties around town. They load them in a car in the yards here in Leavenworth, and when the car is filled I ship them back to Kansas City, Mo.

"Q. Now, when your drivers go around to take up these empties they sometimes collect from customers, don't they?

"A. Why, they do if I give them a bill, a statement.

The State v. Kirmeyer.

"Q. And how often do you give them a bill to collect when they take up empties? A. Well, I could not remember as to that.

"Q. About how often? A. Oh, I could not say; it depends on what locality they are going to and who the customers are. Most of the people I collect from. . . .

"Q. What did those receivers do here, so far as you were concerned? A. Why, they scared everybody up.

"Q. After that you moved across the river? A. Everybody moved.

"Q. You have more family trade than you had then? A. Why yes, in family trade.

"Q. Did you do any family trade before you went to Stillings? A. Yes, sir.

"Q. Delivered liquor at residences? A. Delivered beer.

"Q. Delivered beer at residences. What change, if any, has been made in your method of doing business, so far as the family trade is concerned, since you went to Stillings? A. Well, there ain't much change in the way of doing business. . . .

"Q. Do you place these labels on yourself or furnish them to the drivers? A. I give them the labels and they paste them on.

"Q. All liquor you ship to Oskaloosa you bill out from Leavenworth? A. We bill it Stillings and they bill it Leavenworth.

"Q. You send your driver with beer here to the depot in Leavenworth and they ship it from Leavenworth? A. I make out the bill of lading.

"Q. Where do you deliver it to the railroad company? A. At their depot.

"Q. They don't take the bill of lading you make out? A. They change it from Stillings to Leavenworth.

"Q. They do not accept it as shipping it from Stillings? A. Well, they have.

"Q. They have no depot? A. No, they have no depot.

"Q. The first place it passes out of your hands is in the city of Leavenworth? A. At the depot.

"Q. Up to that time you have it in your possession, the possession of your driver? A. Yes, sir. . . .

"Q. And the bulk of your shipments to Kansas points are billed from the city of Leavenworth, are they not? A. Yes, sir.

"Q. And never pass out of your hands until they reach the city of Leavenworth? A. Why, of course not.

"Q. Now, I believe you said that when any one would call you up at No. 313 here for an order, you would tell them to call up at Stillings. Is that right? A. Yes, sir.

"Q. When they do call up there at No. 313 and ask for beer, you tell them to call up Stillings? A. I would say, 'Call up across the river.' . . .

"Q. Prior to the appointment of these receivers you were in business here? A. Yes, sir.

"Q. And the only purpose you had in moving from here to Stillings was on account of the excitement and the way they were going after them for selling liquor. A. No, it was on account of the law.

"Q. As a matter of fact, at that time you had a lot of customers? A. Yes, sir.

"Q. And on account of the enforcement of the prohibitory law you moved across the river? A. They told me I had to move.

"Q. How much of your mail would you say you get over here? A. I do not get but very little mail.

"Q. You get orders for beer over here? A. No, sir.

"Q. None of them? A. Oh, they might send in one once in a while and I would send it back, just as I stated this morning, if I think it is a beer order. I can always tell; there is only a few towns I get them from; I cross it off and address it to Stillings.

"Q. Why is it you take out of your box a letter which you think contains a beer order and send it to yourself at Stillings and not open it here? A. I might take it over myself.

"Q. Why do you not open it? A. Because it is against the law.

"Q. Your purpose in carrying it back—your purpose in putting it back in the post office and carrying it to Stillings is to keep from violating the law? A. They are n't very few of those.

"Q. Is that the purpose? A. Yes, sir. . . .

"Q. Now, this beer from which these orders were filled, how was it kept—all in one mass? A. It was all piled up in a pile.

"Q. And when you go to fill the various orders you pick up the cases and have them labeled with the names of the party to whom you want them to go, and then

the drivers take them to the various parties; is that right? A. Yes, sir."

Within three days after the findings were presented the state moved for a modification of the 15th finding so as to find that the methods of the defendant and conduct of his business were but a shift, device or subterfuge to evade the law, and for modifications of other findings. The court refused to modify the 15th finding, but made some modifications in others, and thereupon, on July 20, 1912, a motion of the state for judgment on the finding was denied. Judgment was rendered against the state for costs. On the same day a motion of the state for a new trial was overruled.

The opinion of the court was delivered by

BENSON, J.: By the prohibitory liquor law of 1881, enacted pursuant to the constitutional amendment of the preceding year, and in various amendments and supplemental acts, the manufacture, sale or barter of spirituous, malt, vinous, fermented or other intoxicating liquor was prohibited, provided that sales might be made for medical, scientific and mechanical purposes, as provided in the act. At the legislative session of 1909, amendments were made eliminating the exceptions, making the prohibition absolute. (Gen. Stat. 1909, §§ 4361, 4362.) At the next legislative session an amendment was adopted providing that sales of alcohol in specified quantities might be made by certain wholesale druggists under restrictions therein stated. (Laws 1911, ch. 178.). The prohibitory law provides that any person who shall directly or indirectly sell any of the liquors referred to shall be punished as in the act specified. (Gen. Stat. 1909, § 4362.) It further provides that:

"Any person who shall take or receive any order for intoxicating liquor from any person in this state, or any person who shall, directly or indirectly, contract for the sale of intoxicating liquor with any person in this state, shall be deemed guilty of a misdemeanor,

and upon conviction thereof shall be punished therefor as provided in this act for selling intoxicating liquor." (Gen. Stat. 1909, § 4365.)

It is also declared that:

"The giving away of intoxicating liquor, or any shifts or device to evade the provisions of this act, shall be deemed an unlawful selling within the provisions of this act." (Gen. Stat. 1909, § 4372.)

Provisions are also made for the punishment of offenders who maintain places or are guilty of practices in violation of the law which are denounced as common nuisances, and for abating and enjoining such nuisances. (Gen. Stat. 1909, §§ 4387, 4388.)

It was held in *The State v. Rabinowitz*, 85 Kan. 841, 118 Pac. 1040, that acts done in violation of law or which are against good morals are public nuisances, and that the sale and delivery of intoxicating liquors on the streets and alleys of a city publicly, repeatedly and persistently, is a common nuisance, which may be enjoined in a court of equity under section 265 of the civil code by an action in the name of the state.

The question to be determined here is whether the facts proven are sufficient to bring the case within these principles. The defendant contends that his business is protected as interstate commerce under the commerce clause of the federal constitution. It appears that he was keeping for sale and selling beer for years in Leavenworth in violation of law until he became alarmed by the appearance of receivers in prosecutions against brewers. He says this "scared everybody up," and, as he says, "everybody" moved across the river, and admits that there was not much change in the way of doing business. The principal changes appear to be the storage of his stock just across the river in Missouri, where eight or ten liquor warehouses were established convenient to Kansas, but where there was no station agent or post office. At the time when

he thus moved across he leased another place in Leavenworth, equipped it with telephones, quartered his teams and wagons there, and continued to use them in making deliveries as he had before done. When orders were received at this place in Leavenworth by mail he took or sent them into Missouri before even opening them. Applicants for beer by telephone at the number carried in his advertisement were told to call up across the river. Although his drivers did not take orders to his knowledge, they made collections when he gave them bills for, that purpose. Empties were handled directly from the Leavenworth place of business to the Leavenworth depot. Shipments to points in Kansas outside the city were made at the same depot. Kegs and other receptacles were labeled by the defendant or by his teamsters to fill orders in Leavenworth, and hauled daily to customers in the city. Why was this warehouse established just across the river, which required over a mile of extra hauling and the payment of tolls at the bridge? Why were letters, received by the defendant in person at his place of business in Leavenworth, remailed to be again delivered to himself at Stillings, a mile and a half away? Why did he refrain from opening orders for beer until he was across the bridge? In short, why did he resort to these new methods? It is not unjust to the defendant to say that his own testimony furnishes the answer. "It was on account of the law." Plainly stated, these things appear to have been done to evade the laws of this state—to carry on business of the character theretofore done in violation of law in such a manner as to avoid its penalties.

We do not overlook finding No. 15, quoted above, that these things were not intended as a shift and that none of these circumstances tended to circumvent the law, but this finding is a conclusion or complex fact deduced from the underlying, basic facts found and

stated in detail and which do not support the conclusion. Neither is it supported by the testimony of the defendant himself. The basic facts must prevail over such conclusion. (*C. B. U. P. Rld. Co. v. Henigh, Adm'r.,* 23 Kan. 347, 359, 33 Am. Rep. 167; *Penrose v. Cooper,* ante, p. 210, 128 Pac. 362; *Warder v. Enslen,* 73 Cal. 291, 14 Pac. 874.)

The finding that the telephone numbers 313 were not changed through oversight relates to the advertisement. The telephone service by that number was installed at 117 Delaware street, when the move was made across the river, as shown by other findings and by Mr. Kirmeyer's testimony. Such practices as the storage of liquor across the state boundary, the remailing of letters received in Kansas, to himself in Missouri, and the repetition of telephone orders across the line, can not give the high sanction of the federal constitution to an otherwise unlawful traffic.

An interpretation of the law which gives effect to the mere form without regarding the substance only serves to bring its administration into reproach. The broad question here is whether the defendant was really engaged in commerce between the states of Missouri and Kansas, or was he only seeking by tricks and devices to evade the laws of his state—doing by indirection that which could not lawfully be done by ordinary and direct methods. Real interstate business needs no such methods to establish its character, and a wholesome regard for the administration of justice will not tolerate such evasions.

Numerous cases in the federal supreme court are cited by the defendant wherein persons engaged in good faith in interstate commerce have been protected under the commerce clause of the constitution. There is no disposition in this court to hold contrary to these decisions. The opinions of that court, however, do not preclude a fair inquiry into methods and practices in

The State v. Kirmeyer.

order to determine whether transactions under investigation constitute legitimate interstate commerce or are colorable merely and intended to evade and defeat the just operation of the constitution and law of the state.

In *Austin v. Tennessee,* 179 U. S. 343, the question of good faith was considered. The court said:

"Without undertaking to determine what is the proper size of an original package in each case, evidently the doctrine has no application where the manufacturer puts up the package with the express intent of evading the laws of another state, and is enabled to carry out his purpose by the facile agency of an express company and the connivance of his consignee. This court has repeatedly held that, so far from lending its authority to frauds upon the sanitary laws of the several states, we are bound to respect such laws and to aid in their enforcement, so far as can be done without infringing upon the constitutional rights of the parties." (p. 360.)

Referring to the claim that each of the packages of cigarettes was a separate and distinct importation, the court said:

"We can only look upon it as a discreditable subterfuge, to which this court ought not to lend its countenance." (p. 361.)

The right of the state to protect its citizens with respect to commodities deemed injurious to health is thus referred to in the same opinion:

"The doctrine that the silence of Congress as to what property may be of right carried from one state to another means that every article of commerce may be carried into one State from another and there sold, ought not to be extended so as to embrace articles which may not unreasonably be deemed injurious in their use to the health of the people. . . . Of course, it is one thing to force into a State, against its will, articles or commodities that can have no possible connection with or relation to the health of the people. It is quite a different thing to force into the markets of a State, against its will, articles or commodities which, like cigarettes, may not unreasonably be held to be injurious to health." (p. 362.)

In *Cook v. Marshall County*, 196 U. S. 261, it was said:

"While it is doubtless true that a perfectiy lawful act may not be impugned by the fact that the person doing the act was impelled thereto by a bad motive, yet where the lawfulness or unlawfulness of the act is made an issue the intent of the actor may have a material bearing in characterizing the transaction. . . . So where the lawfulness of the method used for transporting goods from one State to another is questioned, it may be shown that the intent of the party concerned was not to select the usual and ordinary method of transportation, but an unusual and more expensive one, for the express purpose of evading or defying the police laws of the State. If the natural result of such method be to render inoperative laws intended for the protection of the people, it is pertinent to inquire whether the act was not done for that purpose, and to hold that the interstate commerce clause of the Constitution is invoked as a cover for fraudulent dealing, and is no defense to a prosecution under the state law. . . . The power of Congress to regulate commerce is undoubtedly a beneficient one. The police laws of the State are equally so, and it is our duty to harmonize them. Undoubtedly a law may sometimes be successfully and legally avoided if not evaded, but it behooves one who stakes his case upon the letter of the Constitution not to be wholly oblivious of its spirit." (pp. 271, 272, 273.)

That a party while doing business by methods appearing to place it under the shield of interstate commerce may at the same time be engaged in violating the state law was conceded in *Adams Express Co. v. Kentucky*, 206 U. S. 129, 137, although it was held by the majority of the court that such facts were not shown. Justice Harlan, in a dissent in that and other cases decided with it, stated his belief that they were not cases of legitimate interstate commerce, but showed only devices or tricks to evade or defeat the laws of Kentucky. We understand the majority opinion as assenting to the legal effect of such conduct if proven, differing with Justice Harlan, however, upon the proof.

It is true that a citizen of Kansas who finds that his business is prohibited by our laws may in good faith engage in the same business in another state where the legal obstacle does not exist. But he may not under the guise of moving across the state line, and other shifts or devices to evade the statutes of the state, continue in the prohibited business here and be immune from the penalties of our law.

From the facts found by the court and from the testimony of the defendant, it appears that his business was not legitimate interstate commerce but was carried on in violation of the statutes of this state and is subject to abatement and injunction.

The judgment of the district court is reversed with instructions to enter judgment for the state as prayed for in the petition.

SYLLABUS BY THE COURT.

